UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOHN AKANA and NUMERA TALANOA, individually, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL DYNAMICS LAND SYSTEMS CUSTOMER SUPPORT COMPANY, a Texas corporation licensed to do business in the State of Washington, <br><br> Defendant. | Case No. C09-5670RJB <br><br> ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the court on Defendant's Motion for Summary Judgment Dismissing John Akana's Claims (Dkt. 33) and on Defendant's Motion for Summary Judgment Dismissing Numera Talanoa's Claims (Dkt. 37). The court has considered the pleadings filed in support of and in opposition to the motions, heard oral argument on the motions, and has considered the file herein.

## RELEVANT FACTS

General Dynamics Land Systems Customer Support Company (General Dynamics) designs, builds and supports a variety of armored vehicles, including the United States Army's Stryker combat vehicle. Joint Base Lewis-McChord (JBLM), Washington, houses the General Dynamics Support Services Company - U.S. Army Stryker Program, which is responsible for coordinating and

ORDER
Page - 1

1  overseeing Stryker support operations in various locations throughout the world.

2  Plaintiff Numera Talanoa served in the United States Army from 1975 through 1997, when he
3  retired from the Army. In 2002, Mr. Talanoa began working for General Dynamics as a New
4  Equipment Training Instructor, responsible for providing training to U.S. Army soldiers on the
5  Stryker combat vehicle. In 2005, Mr. Talanoa was promoted to an instructor/trainer lead position. As
6  a lead, Mr. Talanoa was responsible for training instructors, ensuring that the instructors did their
7  jobs, and making sure the instructors had all the information they needed to train the customers.

8  In April of 2006, plaintiff John Akana began working for General Dynamics as a contractor,
9  following a 21-year career in the United States Navy; after a few months as a contractor, he was hired
10 by General Dynamics at a New Equipment Training Instructor.

11 Both Mr. Talanoa and Mr. Akana were based out of what is now JBLM.

12 In July of 2006, approximately 82 New Equipment Training instructors, including Mr.
13 Talanoa and Mr. Akana, deployed to Oahu, Hawaii to train the 2/25 Brigade. Of the 82 New
14 Equipment Training instructors, twelve, including Mr. Akana, were of Hawaiian/Pacific Islander race
15 and/or national origin.

16 The site manager for the Hawaii deployment was a General Dynamics instructor named
17 Johnny Hill. As the site manager, Mr. Hill was responsible for overseeing the solders' training and
18 facilitating the process of securing housing accommodations for all of the instructors.

19 Throughout the deployment, the instructors were divided into teams and each team had a
20 "lead" responsible for overseeing the team's training. One of the team leads was an instructor named
21 Dave Anderson. Mr. Akana's team lead was Mr. Talanoa. However, Mr. Talanoa arrived in Hawaii a
22 month or so after the other instructors. For the first month or two of the deployment, Mr. Akana
23 taught on Anderson's team.

24 In their depositions, Mr. Talanoa and Mr. Akana testified that, while during the Hawaii
25 assignment, Mr. Anderson and Mr. Hill made derogatory comments about (1) Hawaiian food ("Why
26 do you eat that Spam masubi [sic]? That crap will make you insane."); (2) Hawaiians ("Fucking
27 Hawaiians aren't Americans. Fucking Hawaii is not a state. I hate fucking Hawaiians."). Dkt. 41-1,
28 at 28-29. Mr. Akana stated that Mr. Hill looked directly at Mr. Akana when he made the comments

ORDER
Page - 2

about Hawaiians. Dkt. 41-1, at 29-30.  Mr. Akana stated that he pulled Mr. Hill to the side after the first couple of incidents, and asked to talk to him, but Mr. Hill refused.  Dkt. 41-1, at 30.  Mr. Akana testified in his deposition that these derogatory comments were made at every Thursday meeting, and at other times. Dkt. 41-1, at 75. Mr. Akana stated that he was also prohibited from wearing shirts and hats expressing Hawaiian pride, even when he was not instructing soldiers. Dkt. 41-1, at 41.  Mr. Akana stated that, when he complained to Mr. Hill about problems with his housing, Mr. Hill told him, if he didn't quit complaining, Mr. Hill would move him "out there with all the other locals." Dkt. 41-1, at 26.  Mr. Akana was subsequently moved to new housing.  Dkt. 43-1, at 26.  Mr. Akana stated that Mr. Hill also told him that if he kept complaining, Mr. Hill would send him back to Ft. Lewis. Dkt. 41-2, at 9.

Mr. Akana stated that, when Mr. Akana had to go to the hospital for an on-the-job injury, Mr. Hill told him not to eat the food in Hawaii. "It will kill you or make you stupid." Dkt. 43-1, at 55. Mr. Hill testified in his deposition that he had made a comment that eating the food in Hawaii would make you sick, since other individuals in the deployment had gotten sick from eating the food. Dkt. 34-2, at 58.   Mr. Talanoa stated that he told Mr. Hill and Mr. Anderson that they needed to watch what they said in front of people because there were local hires who were Hawaiian who heard the comments and were irritated by them.  Mr. Talanoa stated that he heard both Mr. Hill and Mr. Anderson make the statement that Hawaiians are not Americans, during several meetings.  Mr. Talanoa stated that he asked Mr. Anderson to stop making the comments, but that Mr. Anderson responded that he could say what he wanted to say.

Mr. Akana stated in his deposition that Mr. Hill told him and other instructors not to talk to anyone outside the Hawaii deployment about what was happening in Hawaii. Mr. Akana interpreted this statement to mean that no one was to talk about anything. Dkt. 41-1, at 49-50.  Mr. Anderson stated in his deposition that he gave this instruction because there had been turmoil in the deployment as a result of an ongoing lawsuit by environmentalists, a shutdown of the training, and direction by the Army that the trainers were not to communicate with friends and family outside of Hawaii. Dkt. 34-2, at 51-52.

Mr. Akana testified that no one other than Mr. Hill or Mr. Anderson did anything while they

were in Hawaii that he felt was discriminatory based on his race or national origin. Dkt. 34-1, at 12.

In December of 2006, General Dynamics' ethics officer, Al Madrona, visited the General Dynamics employees in Hawaii. Mr. Akana stated that he complained to Mr. Madrona about the derogatory ethnic comments made by Mr. Hill and Mr. Anderson. Dkt. 34-1, at 20. Mr. Akana testified in his deposition as follows:

> Q. And what specifically did you tell Mr. Madrona was going on in Hawaii?
>
> A. I told him that there was some comments and statements being made that I believed weren't right and that were hurtful. And he asked who was saying it, and I told him, well, if you're asking for names, it's the site manager. He's saying these at the meetings that we have on Thursdays, the site manager Johnny Hill.
>
> Q. Did you tell him you thought the comments were discriminatory based on your race and national origin?
>
> A. Yes, I did.
>
> Q. Did you tell him specifically what the comments were?
>
> A. Yes, what I just mentioned here earlier about the Hawaiians.
>
> Q. Is that all of the comments that are listed in bullet points under point No. 1, workplace discrimination?
>
> A. Yes, that's correct, and also the food incident.
>
> Q. And you told Mr. Madrona about all of these comments?
>
> A. Yes, I did. Mr. Madrona never got back to John about the discriminatory comments.

Dkt. 41-1, at 33. Mr. Akana stated that Mr. Madrona told him that Mr. Madrona would send an email to the leads, supervisors, and managers to tell them that this behavior needed to stop. Dkt. 41-1, at 31. Mr. Akana stated that Mr. Madrona never got back to him about the discriminatory comments. Dkt. 41-1, at 35. The allegedly offensive comments continued after Mr. Akana told Mr. Madrona about them. Dkt. 41-1, at 74.

Mr. Akana stated that he attempted to discuss the matter with Thomas Rush, a General Dynamics manager, when Mr. Rush visited Hawaii, but Mr. Rush told Mr. Akana that he didn't have time. Mr. Talanoa testified in his deposition that he also told Mr. Madrona and Mr. Rush that Mr. Hill and Mr. Anderson were making comments that were offensive to Hawaiians. Mr. Talanoa stated that he told Mr. Rush that Mr. Akana had an issue he wanted to discuss with Mr. Rush.

Mr. Akana and Mr. Talanoa returned to Ft. Lewis from Hawaii in July of 2007.

ORDER
Page - 4

After he returned to Ft. Lewis from the Hawaii deployment, Mr. Akana contacted the EEOC to complain about what he believed to be ethnic harassment he had experienced while in Hawaii. Mr. Akana also called the General Dynamics ethics hotline to inform the company about the harassment. Mr. Akana filed a complaint of discrimination on July 2, 2007. Dkt. 41-2, at 3. Mr. Akana testified in his deposition that, shortly after this, he heard Mr. Hill tell General Dynamics employees to "plead the fifth" to Mr. Madrona, who was investigating the EEOC complaint. Dkt. 41, at 58; Dkt. 43-1, at 87-88.

Mr. Talanoa stated in his deposition that he provided Mr. Akana with support when Mr. Akana was submitting his complaint to the EEOC. Dkt. 38, at 16. Mr. Talanoa stated as follows:

> I supported his initial write-up in reference to the complaint that he put in with the EEOC, and then supporting him in reference to going forward with it and just being there for him when he needed to–you know, support as a leader, okay?

Dkt. 38, at 16.

Mr. Talanoa testified at his deposition that he overheard a conversation between Mr. Hill and Mr. Anderson:

> Q. Have you ever overheard them make any comments that you believe were retaliatory?
>
> A. Yes, ma'am.
>
> Q. Could you tell me about those, please?
>
> A. I was sitting if my cubicle. Mr. Hill's cubicle was behind mine. There's a wall. They're very thin. He sits in a corner. I was sitting there doing my business in reference to getting the day started. Mr. Hill was sitting at his. Mr. Anderson went to his office, and I could hear them. It's almost like they wanted me hear, that they were going to make -- well, one was they knew about the investigation that's going on in reference to the discrimination complaint by Mr. Akana. After that, they said that they were going to make Akana's life a living hell while he's here.
>
> Q. Who -- which one of them made that comment?
>
> A. Mr. Anderson.
>
> Q. How did Mr. Hill respond to that comment, if you know?
>
> A. He said, "Roger that." He goes, "Yes."
>
> Q. When did this comment take place?
>
> A. When we got back from Hawaii. I don't remember the month, okay? But I know it was when we returned. It was about a month after that we got back, so it was probably in July, July, August time frame.

Q. Did you report that comment to anyone at GDLS?

A. No.

Q. Why not?

A. Because I knew if I went upstairs to tell Mr. Rush, okay, Mr. Rush would have told me to get out of his office and that I'm complaining.

Dkt. 52, at 6-8.

Mr. Talanoa stated that he provided a statement to the EEOC on March 4, 2009, in support of Mr. Akana's charge of discrimination. Dkt. 38, at 21. Mr. Talanoa stated that, to his knowledge, no one at General Dynamics was aware of the statement he submitted to the EEOC in support of Mr. Akana's charge of discrimination. Dkt. 38, at 22. He stated that he did not speak to anyone at the company about Mr. Akana's charge of discrimination (Dkt. 38, at 17-18); that he did not tell anyone at the company that he felt Mr. Akana was being discriminated against because of his race or national origin (Dkt. 38, at 19); that he told his pastor and his wife that Mr. Akana was being treated unfairly with regard to Mr. Akana's leave of absence because Mr. Akana had complained of discrimination, but did not tell anyone in the company (Dkt. 38, at 20); that he did not tell anyone, other than Mr. Akana, Mr. Bruce Geary and Mr. Rush that he believed Mr. Akana was being treated unfairly in regard to his credit card purchases because of his complaints of discrimination (Dkt. 38, at 20); and that he never told anyone at the company that he felt Mr. Akana was being discriminated against based on his Hawaiian ethnicity (Dkt. 38, at 20).

Mr. Talanoa stated that, after he returned to JBLM, in March of 2008, he was disciplined when instructors he was supervising did some damage to a training area. Dkt. 38, at 23-24. Mr. Talanoa stated that "they were trying to find whatever they can to pin on me to get me out of the position that I was in. And that was one of the biggest things that they had was they say damage to the training area, but it was repaired. It was done." Dkt. 38, at 24-25. See also Employee Corrective Behavior Report. Dkt. 39. Mr. Talanoa stated that he believed that another incident occurred in the motor pool (not involving Mr. Talanoa), but no one was ever disciplined for that incident. Dkt. 38, at 26.

When asked why he believed he was being retaliated against, Mr. Talanoa stated as follows:
That's what I don't understand, you know. I mean, they were trying to find anything and

> everything to try and pin on me to put something on me so that way once the realignment came about in reference to moving from–to lead positions to supervisor position, that was a discriminatory portion to get me–to not give me that position as a supervisor.

Dkt. 38, at 26.

Mr. Talanoa stated that, in July of 2008, Mr. Hill and Mr. Rush called him at home "and accused me of withholding evidence concerning misconduct by an individual who was not on my team." Dkt. 38, at 28. Mr. Hill later called Mr. Talanoa back and told him that the individual in question was not on Mr. Talanoa's team. Dkt. 38, at 30. Mr. Talanoa stated that he believed that this incident was retaliatory.

> Well, like I said, you know, everything leads up to they're trying to get everything that they can. Instead of looking at the whole information, they were trying to look at bits of information to try and get me written up or done something to that point.

Dkt. 38, at 31.

Mr. Talanoa stated that Mr. Hill, Mr. Anderson, and Mr. Rush were friends. Dkt. 38, at 32. Mr. Talanoa stated that he had overheard comments made by these individuals that Mr. Talanoa was a "whiner." Dkt. 38, at 33.

On July 31, 2008, Mr. Talanoa applied for promotion to supervisor. Dkt. 38, at 38.

On September 2, 2008, Bruce Gerry (NET Manager), Richard Torres, Jr. (Human Resources Representative), and Mr. Rush (JBLM Operations Manager) interviewed Mr. Talanoa for two supervisor positions. Dkt. 38, at 44-47. Mr. Gerry did not recommend Mr. Talanoa for promotion. Dkt. 39, at 10-11 and 19-20. Mr. Torres stated that Mr. Talanoa was a good candidate but not in the top 7 for the first position; and that other candidates were more qualified for the second position. Dkt. 39, at 14-15 and 23-24. Mr. Rush recommended Mr. Talanoa for both positions. Dkt. 39, at 12-13, and 21-22. Of the individuals considered for the supervisor positions, Mr. Rush rated Mr. Talanoa at the highest level, relative to the other candidates. Dkt. 39-1, at 44-45 and 47-49. The panel members discussed the top candidates with Human Resources; and then Human Resources and senior leadership at General Dynamics discussed the candidates. Dkt. 39, at 2-3. Each of the individuals selected to fill a supervisor position scored significantly better than did Mr. Talanoa during the interview process. Dkt. 39, at 3. Mr. Talanoa was not selected for the promotion to supervisor. He stated that he believed that he was not selected for a supervisor position because of

ORDER
Page - 7

Mr. Rush's feelings toward him. Dkt. 38, at 33.

On December 5, 2008, Mr. Talanoa filed a charge of discrimination with the EEOC, alleging that he was retaliated against, due to his support of a subordinate who filed a charge of discrimination against General Dynamics. Dkt. 38, at 38. Mr. Talanoa stated in his EEOC charge that he was not promoted to supervisor, allegedly due to misconduct issues, when other employees who engaged in similar misconduct were not disciplined, and one was promoted to supervisor. Dkt. 38, at 38.

At the time of his deposition in October of 2010, Mr. Talanoa was still an employee of General Dynamics, working as an instructor/trainer lead. Dkt. 38, at 12. He received merit pay increase in salary every year, except for 2009, when he was out on disability. Dkt. 38, at 12-13.

Mr. Akana stated that, after he returned to JBLM, he was assigned, by direction of Mr. Rush, to teach a different type of vehicle that he considered less desirable (Dkt. 34-1, at 48-49); his work and classes were constantly scrutinized (Dkt. 34-1, at 63); he was accused by Mr. Rush of driving a vehicle into an unauthorized area, which was not true; he was accused by Mr. Rush of abusing the leave program (Dkt. 34-1, at 65); and he received a written reprimand related to his use of a corporate American Express card, when he had not made unauthorized purchases as alleged and his account was not delinquent (Dkt. 34-1, at 65). Susan Williams, Manager of Human Resources for General Dynamics at JBLM stated in her declaration that Mr. Akana was issued a disciplinary notice in 2008 because General Dynamics records indicated that the credit card was used for a non-business purpose and that there was a delinquent balance on the account. Dkt. 35, at 3. Mr. Akana stated in his deposition that he had records that showed that there no irregularities in the credit card purchases and that he had paid the balance. Mr. Akana also stated that he was written up for failure to meet weight requirements, but at oral argument on these motions, counsel conceded that Mr. Akana was not relying on the weight requirement issue as support for his position.

At the time of his deposition in October of 2010, Mr. Akana was till an employee of General Dynamics, working at JBLM.

On October 23, 2009, Mr. Akana and Mr. Talanoa filed this complaint, alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for race and national origin discrimination, harassment, retaliation, and hostile work environment. Dkt. 1.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

The Ninth Circuit has provided additional guidance when an employer brings a motion for summary judgment in an employment discrimination case. Such motions must be carefully examined in order to zealously guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the

1    credibility of the witnesses. *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

2    This high standard means that an employee need only produce "very little evidence" to survive

3    summary judgment in a discrimination case because the ultimate question is one that can only be

4    resolved through a "searching inquiry" – one that is most appropriately conducted by the factfinder,

5    upon a full record. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal

6    quotations omitted).

## TITLE VII

8    Under Title VII of the Civil Rights Act of 1964, it is unlawful "for an employer– (1) to fail or

9    refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

10   respect to his compensation, terms, conditions, or privileges of employment, because of such

11   individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).

## MOTIONS FOR SUMMARY JUDGMENT

13   On November 24, 2010, General Dynamics filed this motion for summary judgment,

14   requesting that Mr. Akana's claims be dismissed. Dkt. 33. On November 24, 2010, General

15   Dynamics filed this motion for summary judgment, requesting that Mr. Talanoa's claims be

16   dismissed. Dkt. 37.

## DISCUSSION

18   **1. Numera Talanoa**

19   The complaint alleges claims for retaliation and race and national origin-based harassment.

20   Dkt. 1, at 5-7. However, it is undisputed that the only claim Mr. Talanoa presented to the EEOC was

21   a claim for retaliation. See Dkt. 43-2, at 2. Mr. Talanoa's race and national-origin based harassment

22   claim is therefore unexhausted; the court is without jurisdiction to consider this claim. See *B.K.B. v.*

23   *Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir.2002)(To establish federal subject matter

24   jurisdiction, a plaintiff is required to exhaust his or her administrative remedies before seeking

25   adjudication of a Title VII claim.). Mr. Talanoa appears to concede that the only claim before the

26   court is retaliation, arguing only this claim in his opposition to General Dynamics' motion for

27   summary judgment. *See* Dkt. 42.

28   Mr. Talanoa contends that he was retaliated against by General Dynamics for supporting Mr.

1    Akana's complaints about the alleged offensive race/national origin comments made by Mr. Hill and
2    Mr. Anderson during the Hawaii assignment. General Dynamics contends that Mr. Talanoa did not
3    engage in any protected activity, and, even if he had, there is no adverse employment action. General
4    Dynamics contends that it had a legitimate nondiscriminatory motive for not promoting him; and that
5    the only person who Mr. Talanoa alleges had discriminatory animus toward him in that promotion
6    decision was Tom Rush, who recommended Mr. Talanoa for both positions.

7    To establish a retaliation claim under Title VII, "a plaintiff must show (1) involvement in a
8    protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks*
9    *v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000) (*citing Payne v. Norwest Corp.*, 113 F.3d
10   1079 (9th Cir.1997)). At that point, "the burden of production shifts to the employer to present
11   legitimate reasons for the adverse employment action. Once the employer carries this burden,
12   plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the
13   employer was a pretext. Only then does the case proceed beyond the summary judgment stage." *Id.*

14   "The causal link between a protected activity and the alleged retaliatory action can be
15   inferred from timing alone when there is a close proximity between the two." *Thomas v. City of*
16   *Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th
17   Cir.1987) (holding that sufficient evidence of causation existed where adverse employment action
18   occurred less than three months after the protected activity); *Miller v. Fairchild Indus., Inc.*, 797 F.2d
19   727, 731-32 (9th Cir.1986) (concluding that there was adequate evidence of a causal link where the
20   retaliatory action occurred less than two months after the protected activity).

21   In this case, Mr. Talanoa stated that he told Mr. Madrona and Mr. Rush that Mr. Hill and Mr.
22   Anderson were making comments that were offensive to Hawaiians. Assuming that he engaged in
23   protected activity, Mr. Talanoa has not shown that there was any adverse employment action caused
24   by the complaints he made and the support he gave to Mr. Akana. The "support" Mr. Talanoa gave to
25   Mr. Akana was personal support to Mr. Akana. There is no evidence that anyone at General
26   Dynamics knew of his support of Mr. Akana's EEOC complaint until Mr. Talanoa gave a statement
27   to the EEOC on March 4, 2009, in support of Mr. Akana's charge of discrimination.

28   Mr. Talanoa contended that he talked to Mr. Madrona about the offensive comments of Mr.

1  Hill and Mr. Anderson when Mr. Madrona was in Hawaii.  Mr. Talanoa has produced no evidence
2  that Mr. Madrona retaliated against Mr. Talanoa, or that Mr. Rush or Mr. Hill had any knowledge of
3  Mr. Talanoa's conversation with Mr. Madrona in 2006/2007.  Further, it was fifteen months between
4  the time that Mr. Talanoa spoke to Mr. Madrona in Hawaii, and March of 2008, when Mr. Talanoa
5  received a behavior report as a result of the alleged property damage by his team, and the denial of
6  his application for promotion to supervisor during the Fall of 2008.  There is not a close proximity
7  between the alleged protected activity and the alleged retaliatory action.  *See Thomas v. City of*
8  *Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004)("The causal link between a protected activity and the
9  alleged retaliatory action can be inferred from timing alone when there is a close proximity between
10 the two."); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987) (holding that sufficient evidence
11 of causation existed where adverse employment action occurred less than three months after the
12 protected activity); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir.1986) (concluding
13 that there was adequate evidence of a causal link where the retaliatory action occurred less than two
14 months after the protected activity). Finally, and most significant, Mr. Talanoa believed that Mr.
15 Rush harbored retaliatory animus toward him, based upon Mr. Talanoa's support of Mr. Akana.
16 During the interview process for the two supervisor positions, Mr. Rush recommended Mr. Talanoa
17 for the positions, and gave him the highest score on the interview.

18 Mr. Talanoa has not met his burden to establish that he engaged in protected activity that
19 caused an adverse employment action.  Even if he had met his burden to establish a prima facie case,
20 General Dynamics has shown that it had legitimate reasons for not promoting Mr. Talanoa to a
21 supervisor position, and Mr. Talanoa has not shown that the failure to promote him to supervisor was
22 a pretext for retaliation.  General Dynamics' motion for summary judgment should be granted and the
23 claims of Mr. Talanoa should be dismissed.

24 **2. John Akana**

25 Mr. Akana alleges claims for hostile work environment, based upon the comments made by
26 Mr. Hill and Mr. Anderson during the Hawaii assignment; and retaliation for complaining about the
27 allegedly offensive racial/ethnic comments. General Dynamics contends that Mr. Akana did not
28 suffer an adverse employment action in Hawaii; the comments made by Mr. Hill and Mr. Anderson

were not sufficiently severe and pervasive as to alter the conditions of Mr. Akana's employment; with regard to housing, Mr. Akana was treated equal to or more favorably than non-Hawaiian employees with housing complaints; Mr. Akana is unable to support his claim for retaliation by providing any connection between his protected activity and the alleged retaliatory acts; and General Dynamics had legitimate nondiscriminatory reasons for all of its actions, and Mr. Akana cannot show a genuine issue of material fact as to whether these reasons were pretexts for unlawful retaliation.

*1. Hostile Work Environment*

"To prevail on a hostile workplace claim premised on either race or sex, a plaintiff must show: (1) that [s]he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998)(*citing Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995)).

The comments alleged by Mr. Akana were of a racial/national origin character. Mr. Akana complained or attempted to complain about the comments during the Hawaii assignment. There are issues of fact as to whether the conduct was sufficiently severe or pervasive to alter the conditions of Mr. Akana's employment and to create an abusive work environment. Mr. Akana has met his burden to show that there are genuine issues of material fact precluding summary judgment on the hostile work environment claim. General Dynamics' motion for summary judgment should be denied as to the hostile work environment claim.

*2. Retaliation*

To establish a retaliation claim under Title VII, "a plaintiff must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000) (*citing Payne v. Norwest Corp.*, 113 F.3d 1079 (9th Cir.1997)). At that point, "the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. Only then does the case proceed beyond the summary judgment stage." *Id.*

Mr. Akana complained, while he was in Hawaii, about the alleged comments made by Mr. Hill and Mr. Anderson. Mr. Akana also filed an EEOC complaint, shortly after he returned to JBLM. There are issues of fact as to whether the incidents Mr. Akana complains of (changing teaching assignments, scrutinizing his work, accusing him of driving in an unauthorized area, confronting him about abusing the leave program, accusing him of credit card violations) could constitute adverse employments actions. There are also issues of fact regarding whether Mr. Akana was retaliated against for his complaints, particularly in light of Mr. Talanoa's allegedly overhearing Mr. Hill and Mr. Anderson talking about making Mr. Akana's life "a living hell." The evidence of adverse employment actions appears to be very thin, but sufficient at the summary judgment stage to meet Mr. Akana's burden.

Mr. Akana has met his burden to show that there are genuine issues of material fact precluding summary judgment on the retaliation claim. General Dynamics' motion for summary judgment should be denied as to the retaliation claim.

Therefore, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment Dismissing Numera Talanoa's Claims (Dkt. 37) is **GRANTED**. All claims of Mr. Talanoa against defendant General Dynamics are **DISMISSED WITH PREJUDICE**. Defendant's Motion for Summary Judgment Dismissing John Akana's Claims (Dkt. 33) is **DENIED.** Mr. Akana's claims for hostile work and environment and retaliation may proceed.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 24th day of January, 2011.

Robert J Bryan
United States District Judge